**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **AIMEE CONDAYAN,** an individual, | CASE NO.: _____ |
| Plaintiff, | **COMPLAINT FOR DAMAGES FOR:** |
| v. | 1. **COPYRIGHT INFRINGEMENT;** |
| **JENNIFER MATHIEU,** an individual; **ROARING BROOK PRESS,** a New York corporation**; HOLTZBRINCK PUBLISHING HOLDINGS LIMITED PARTNERSHIP**, a German company; **MACMILLAN PUBLISHERS,** a New York company; **SARAH LAPOLLA**, an individual; **BRADFORD LITERARY AGENCY, INC**. and **DOES 1 to 50**, inclusive, | 2. **BREACH OF IMPLIED-IN-FACT AGREEMENT;** 3. **BREACH OF CONFIDENTIAL RELATIONSHIP;** 4. **MISAPPROPRIATION OF NOVEL IDEA; AND** 5. **VICARIOUS AND/OR CONTRIBUTORY COPYRIGHT INFRINGEMENT** |
| Defendants. | **DEMAND FOR JURY TRIAL** |

Plaintiff, Aimee Condayan, through her undersigned counsel, prays to this Honorable Court for relief and alleges as follows:

## PARTIES

1.      At all times mentioned herein, Plaintiff was and is an individual residing in Hyattsville, Maryland and the sole author of a wholly original novel entitled *"A Zine Called Mike"* (*"Zine"*). Plaintiff is an avid writer, having penned and published several zine and magazine articles as well as rock-and-roll band interviews.

2.      At all times mentioned herein, Defendant JENNIFER MATHIEU ("MATHIEU") was and is an individual residing in Houston, Texas.

3.      At all times mentioned herein, Defendant SARAH LAPOLLA ("LAPOLLA") was and is an individual residing in New York, New York.

4.      At all times mentioned herein, Defendant BRADFORD LITERARY AGENCY, INC. ("BRADFORD") was an is a California corporation and is organized and existing pursuant to the laws of the State of California.

5.      At all times mentioned herein, Defendant ROARING BROOK PRESS ("ROARING BROOK") was and is a New York corporation, and is organized and existing pursuant to the laws of the State of New York.  ROARING BROOK is a division of HOLTZBRINCK PUBLISHING HOLDINGS LIMITED PARTNERSHIP and has its principal place of business in New York, New York.

6.      At all times mentioned herein, Defendant HOLTZBRINCK PUBLISHING HOLDINGS LIMITED PARTNERSHIP ("HOLTZBRINCK") was and is a German company qualified to do business in the States of New York and California (the latter currently under HOLTZBRINCK PUBLISHERS LLC.) HOLTZBRINCK owns and operates several publishing companies such as MACMILLAN PUBLISHING and has its principal place of business in the United

States in New York. At all relevant times mentioned herein, HOLTZBRINCK was and is doing business in New York, New York.

7.     At all times mentioned herein, Defendant MACMILLAN PUBLISHERS, INC. ("MACMILLAN") was and is a Delaware corporation qualified to do business in the State of California, and is organized and existing pursuant to the laws of the State of New York.

8.     Defendants ROARING BROOK, HOLTZBRINCK, and MACMILLAN all sell books, novels, and other written materials within the State of New York and therefore transact business in the State of New York. Mathieu had several book tours in the State New York and provided interviews on the subject matter novel in the State of New York.

9.     Defendants MATHIEU, ROARING BROOK, HOLTZBRINCK, MACMILLAN, LAPOLLA, and BRADFORD shall be collectively referred to as "Defendants".

10.    Plaintiff is unaware of the true names and capacities of the Defendants sued herein as DOES 1 through 50, inclusive, and for that reason, sues such Defendants under such fictitious names. Plaintiff is informed and believes and on that basis alleges that such fictitiously named Defendants are responsible in some manner for the occurrences herein alleged, and that Plaintiff's damages as herein alleged were proximately caused by the conduct of said Defendants. Plaintiff will seek to amend the complaint when the names and capacities of such fictitiously named Defendants are ascertained. As alleged herein, "Defendants" shall mean all named Defendants and all fictitiously named Defendants.

11.    Plaintiff is informed and believes and on that basis alleges that Defendants at all times relative to this action, were the agents, servants, partners, joint venturers, and employees of each of the other Defendants and in doing the acts alleged herein were acting with the knowledge and consent of each of the other

Defendants in this action. Alternatively, at all times mentioned herein, each of the Defendants conspired with each other to commit the wrongful acts complained of herein. Although not all of the Defendants committed all of the acts of the conspiracy or were members of the conspiracy at all times during its existence, each Defendant knowingly performed one or more acts in direct furtherance of the objectives of the conspiracy. Therefore, each Defendant is liable for the acts of all of the other conspirators.

## JURISDICTION AND VENUE

12.     This action arises under the Copyright Laws of the United States (Title 17, U.S.C. §101 *et seq*.) and the common law of the State of New York.

13.     This court has exclusive jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338 in that this action involves claims arising under the Copyright Laws of the United States. To the extent that this action is based on related state claims, the Court has supplemental jurisdiction thereto under 28 U.S.C. § 1367.

14.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391 and 1400 in that Defendants transact business in the county of New York, New York.

## THE FACTS

15.     Plaintiff repeats, alleges and incorporates by reference paragraphs 1 through 14 as through fully set forth herein.

16.     From 2011 to December of 2013, Plaintiff authored a wholly original manuscript for a novel entitled *A Zine Called Mike* (the "Book" or "*Zine*").  In or about December of 2014, Plaintiff authored a second draft thereof.  *Zine* is about a 16-year-old female feminist protagonist's journey of discovery of punk-rock cassette tapes given to her by her estranged father, and the subsequent discovery of underground Riot Grrrl culture (which was a pioneering subculture of the punk rock scene of the 1990s); the lead, a high school junior, publishes an anonymous zine to

speak out about her sexual assault by a seemingly invincible high school football star in their small, conservative Southern Virginia high school.

17.     On or about February 23, 2020, Plaintiff registered the first draft with the U.S. Copyright Office, Registration No.  TXu 2-181-076; and Registration No. TXu 2-181-140 for the revision. A true and accurate copy of the registrations are attached hereto as **Exhibits A-B**).

**PLAINTIFF'S SUBMISSION TO MATHIEU'S LITERARY**
**AGENT SARAH LAPOLLA**

18.     On or about January 10, 2014, Plaintiff conveyed Chapter 1 of *Zine* to New York literary agent Sarah LaPolla of the Bradford Literary Agency ("LaPolla"). Plaintiff included with her work email correspondence that stated, "I'm writing to you because you mention in your bio that you are looking for [young adult] fiction that doesn't shy away from the darker side of adolescence.  For that reason, I think you would enjoy my book.  I've pasted the first chapter below according to your submission guidelines…Thank you for considering *A Zine Called Mike*."  A true and correct copy of this email is attached hereto as **Exhibit C**.

19.     On or about January 20, 2014, LaPolla stated that she "really liked the voice" and was a "huge fan of Riot Grrrl culture" and requested Plaintiff's full "manuscript as a Word .doc".  A true and correct copy of this email is also attached hereto as **Exhibit C.**

20.     On or about January 20, 2014, and per LaPolla's request, Plaintiff submitted *Zine* to LaPolla. A true and correct copy of this submission of *Zine* is attached hereto as **Exhibit D.**

21.     That same day, LaPolla confirmed receipt and said she is looking forward "to reading it"; she also qualified the submission by stating: "Please let me know if you receive an offer of representation from another agent" before LaPolla

5
PLAINTIFF'S  COMPLAINT

reviewed the novel and responded.  A true and correct copy of this email is attached hereto as **Exhibit E.**

22.     Plaintiff is informed and believes and thereon alleges that at that time, LaPolla was already acting as a literary agent for Jennifer Mathieu ("Mathieu"). Furthermore, an agency relationship existed between Mathieu and LaPolla, and Mathieu was, upon information and belief, one of only a handful of clients LaPolla represented at that time, at a maximum.

23.     On or about March 6, 2014, LaPolla emailed Plaintiff stating she was passing on *Zine*, yet she loved the concept and even requested a revision with "a focus on pacing and plot development".  A true and accurate copy of said email is attached here to as **Exhibit F.**

24.     On or about June 17, 2014, Plaintiff indicated to LaPolla that she was working on a revision that she was going to submit to LaPolla; LaPolla responded stating she was "looking forward to taking another look at this once it's finished". A true and accurate copy of said email thread is attached here to as **Exhibit G.**

25.      On or about December 9, 2014, Plaintiff submitted a revised manuscript of *Zine* to LaPolla.  A true and accurate copy of said email along with the attached revision of *Zine* are attached here to as **Exhibit H.**

26.     On or about February 6, 2015, LaPolla emailed Plaintiff with a rejection letter. In said rejection letter, LaPolla stated she was "still such a fan of this premise and really liked [Plaintiff's] writing."  However, she said she was having trouble "connecting to this story overall" and that she lacked interest in "the non-contemporary setting" of the 90s youth culture.  A true and accurate copy of said rejection letter is attached hereto as **Exhibit I.**  Almost immediately thereafter, Plaintiff unfollowed LaPolla on Twitter and was thereafter not privy to her future messages on said social media platform until she discovered the infringing work in 2019.

27.    Plaintiff is the owner of all copyright rights in and to the original creative work, *Zine*, in all of its advancing, original, unique and protected permutations, and has never assigned, licensed or otherwise transferred its copyright protection to any of the Defendants, nor to any other third party.

28.    Plaintiff is informed and believes and thereon alleges that based upon her interactions with LaPolla, custom and practice in the entertainment industry, and the prior dealings between LaPolla and others in the literary space, that LaPolla knew Plaintiff's submission was not gratuitous and was made for the purpose of ultimately selling *Zine* and this was impliedly understood (as revealed by the surrounding circumstances).

29.    *Zine* was received by LaPolla and her agency, which in the entertainment industry, is receipt by Mathieu. *Zine* was given to Mathieu by LaPolla; Mathieu then copied from it substantially.

## MATHIEU'S TIMELINE OF ALLEGEDLY WRITING "*MOXIE*" SUPPORTS A CLAIM OF IDEA THEFT AND COPYRIGHT INFRINGEMENT

30.    On information and belief Plaintiff alleges that Matthieu began work on *Moxie* in or around April 2015.

31.    Thereafter, Mathieu announced she was working with a new agent, Kerry Sparks of Levine Greenberg Rostan Literary Agency ("Sparks") and that she had a book deal for a book entitled *Moxie* along with yet another, still untitled novel. Mathieu further stated that *Moxie* "combines so much stuff I adore – punk rock, lady rights, the 90s, zines, Texas and an interesting, fully-fleshed out female protagonist" and calls it "the book of [her] dreams". Mathieu further stated that Sparks was "the Kathleen Hanna of agenting" which was an exact line used in Plaintiff's *Zine*

(specifically, one character calls another "the Kathleen Hanna of Leslie" (the fictional town in *Zine*).[1]

32.     On or about September 19, 2017, *Moxie* was published.

33.     Given LaPolla started representing Mathieu in mid-2010, and that LaPolla was representing Mathieu during the times that LaPolla was soliciting Plaintiff's Book, it is allege on information and belief that LaPolla, in her role as Matthieu's agent, provided Plaintiff's work to Matthieu.

34.     *Zine* remained within LaPolla's agency as LaPolla did not return or destroy either draft of *Zine,* which she still possessed.  Neither version of *Zine* was ever returned by LaPolla to Plaintiff.

## MATHIEU'S QUESTIONABLE AND CONFLICTING "INSPIRATION"

35.     In an interview with Blogger "Miss Print" published on September 14, 2017, Mathieu provided one version of how the idea for *Moxie* originated:

> *"I was hunting around for my next idea. I like to and have written about my interests and even my obsessions – small towns, cults, high school gossip, etc. – and I was contemplating other interests of mine that I hadn't tackled yet. Feminism and Riot Grrrl came to mind. At first I thought about writing a Riot Grrrl novel actually set in the 90s, but I wanted to write a book set in contemporary life, and I wanted to revisit the Riot Grrrl movement through a modern lens. I was sitting on my couch in my den texting with my friend, book blogger Kate Sowa, and the basic plot for Moxie just came to me in a rush. I texted it to her and she was so excited I knew I had something!*

36.     However, in another interview with @EmmaBooks which aired on YouTube on September 27, 2017, Mathieu joked she is not "one of these writers that

---

[1] Kathleen Hanna is a feminist activist, pioneer of the feminist punk riot grrrl movement, and punk zine writer. In the early-to-mid-1990s she was the lead singer of feminist punk band Bikini Kill.  Source: Wikipedia: The Free Encyclopedia located at https://en.wikipedia.org/wiki/Kathleen_Hanna.

PLAINTIFF'S COMPLAINT

has a million ideas…I'm lucky if I can get one good idea a year which is I think hopefully I guess all you really need if you're going to keep writing." She also explained that "Moxie" was going to be "set in the 90s" but that would be historical fiction" (which was the same thing that LaPolla mentioned when rejecting Plaintiff's work although *Zine* was also set in present day). Quite ironically, despite having stolen the core concept and protectable elements from the book from another female writer, Mathieu nevertheless blankly postured that "feminism is something that has been really important to me" and that this book is her first "romance" and "lighter or more joyful" and therefore, vastly different from every other book she had written in the past. In fact, she also said that while she did a lot of research for past novels, she did not have to do much research for *Moxie* and that it just came "from diving back into [her] own memories" and was the "easiest book to research". Source: EmmaBooks    Interview    with    Jennifer    Mathieu    dated    2017/09/27; https://www.youtube.com/watch?v=StHIdOpXvV0.

37.    In yet another interview with @TalesoftheRavenousReader, which aired on YouTube on October 24, 2017, Mathieu said that she was "inspired by the young women that [she] teaches…and the passion and the…Moxie". Then she further explained that she was inspired by a teacher who called her a "femininazi" and that she hoped her readers were inspired to "fight back". Plaintiff is fighting back. Source: TalesoftheRavenousReader Interview with Jennifer Mathieu dated 2017/10/24; https://www.youtube.com/watch?v=gmzatnTJH5c. It is very common when authors pirate another's work that they have trouble keeping their story straight when discussing their "inspiration" because it is, of course, a fabrication (as they actually stole the work).

**SUBSTANTIAL SIMILARITY BETWEEN *MOXIE* AND *ZINE***

38.     *Moxie* contains *inter alia* the same copyrightable expression as *Zine* in addition to numerous other similarities in the selection and arrangement of both protected and non-protected elements.

39.     Mathieu is credited as the sole author of *Moxie*.

40.     The similarities between *Moxie* and *Zine* are so striking that it is a virtual impossibility that the former could have been created independently from the latter. These similarities include, but are not limited to, the following: Theme, Setting, Plot, Sequence of Events, Characters, Mood and Pace and Dialogue.

41.     Expert Susan McCabe, a University of Southern California English Professor ("McCabe") compared the two works and found compelling similarities. A true and accurate copy of McCabe's *curriculum vitae* is attached hereto as **Exhibit J**. A true and accurate report by McCabe identifying these substantial similarities is attached hereto as **Exhibit K.**

42.     In her report, McCabe opines as follows:  "Analyzing the exhibits exposes shared literary elements and a sustained pattern of selection and use of them to a striking degree in categories including, but not limited to, theme, setting, plot, sequence of events, character, language, dialogue, and mood. Given the fact that so many books in the genre of young adult fiction stem from high school settings where sexuality and sports play a central role, it is no surprise some overlap would exist. However, after careful review, I find the shared elements overwhelmingly substantial."

43.     Among other things, McCabe finds that the theme, for one, is virtually identical in both works: "Rendered from the first-person perspective, the sixteen-year-old protagonists, both Beth Ann Castle in  *Zine* and Vivian Carter in *Moxie*, protest sexual harassment and assault committed by high school football players in an anonymous 'zine,' a low-budget magazine. The zines arose in the 1990's in

response to norms delineated in traditional slick glossies, such as *Cosmopolitan* and *Glamour*; they extolled principles of punk rock and feminism, inspired by Riot Grrl culture, which provides the backdrop for both texts. Each protagonist is motivated by a strong commitment for justice; both engage in romances with an artistic youth on the fringes of a small town, obsessed with its football stars. The players get away with a slate of oppressive behaviors, from slurs to rape. Both stories, however, identically depict a triumph of truth over hypocrisy, and a young girl's struggle to speak out, while falling in love".  A full analysis of every element is found in the attached expert report.

44.    McCabe concludes as follows: "I have found sustained similarities in the Exhibits. I can confirm Condayan's sense that her theme, plot development, sequence of events, characters, language, dialogue and mood show remarkable unmistakable similarity to Mathieu's published novel, *Moxie.*"

### FIRST CLAIM FOR RELIEF
### (COPYRIGHT INFRINGEMENT REGARDING "MOXIE")
### (Against All Defendants)

41.    Plaintiff repeats, alleges and incorporates by reference paragraphs 1 to 40 as though fully set forth herein.

42.    In or about September 19, 2017, Defendants published *Moxie* crediting Mathieu as the writer thereof.

43.    As alleged hereinabove, the named Defendants have infringed upon Plaintiff's copyright by copying wholly original elements from Plaintiff's Book *Zine*, without any permission, in *Moxie*.

44.    Upon information and belief, the named Defendants thereafter intentionally distributed, published, sold, conveyed, and otherwise exploited *Moxie* without authorization, in violation of Plaintiff's rights.

45.     Upon information and belief, the named Defendants have intentionally violated the Federal Copyright Act, Title 17 U.S.C. § 101 *et seq*., entitling Plaintiff to all damages and remedies provided by the Act.

46.     Upon information and belief, the named Defendants continue to infringe upon Plaintiff's copyrights, causing Plaintiff irreparable injury and damage, including through a film adaptation and other related media.  Said infringement entitles Plaintiff to actual and statutory damages, injunctive and other relief provided by the Copyright Act.

## SECOND CLAIM FOR RELIEF
### (BREACH OF IMPLIED-IN-FACT CONTRACT)
### (Against All Defendants)

47.     Plaintiff repeats, alleges and incorporates by reference paragraphs 1 through 46 as though fully set forth herein.

48.     Plaintiff is the exclusive owner of the original ideas contained in *Zine*.

49.     In light of the fact that the Book was specifically solicited by LaPolla, and LaPolla had an opportunity to reject the submission of *Zine* before the submission occurred, LaPolla voluntarily accepted the submission with the implied knowledge of an obligation to pay for the use if she, or one of the clients that she acted as an agent for, actually used the ideas contained therein.

50.     Under all circumstances attending disclosure, Defendants voluntarily accepted the disclosure of the ideas knowing that they had an obligation to compensate and credit Plaintiff in accordance with custom and practice in the entertainment industry in the event Plaintiff's ideas were later used (*i.e.* Defendants had multiple opportunities to reject Plaintiff's submission of *Zine* but failed to do so).  Defendant Mathieu acted by and through her agent at the time the submission was received.

51.    Defendants used Plaintiff's ideas as illustrated above and in the attached report in **Ex. K**. Defendants have not compensated Plaintiff for this use.

52.    By virtue of Defendants' acceptance and utilization of Plaintiff's services and ideas, an agreement was implied-in-fact to pay Plaintiff the reasonable value of those services including credit to Plaintiff as the author thereof, and to employ Plaintiff in connection therewith consistent with custom and practice in the entertainment and book publishing industry.

53.    Plaintiff performed all covenants and conditions required of her pursuant to said agreement. Defendants breached, and continue to breach, said agreement by utilizing and profiting from Plaintiff's ideas without compensation or credit to Plaintiff.

54.    As a result of the foregoing, Plaintiff was damaged in an amount according to proof for *Moxie* and any derivative works thereof.

## THIRD CLAIM FOR RELIEF
### (BREACH OF CONFIDENTIAL RELATIONSHIP)
### (Against LAPOLLA)

55.    Plaintiff repeats, alleges and incorporates by reference paragraphs 1 through 54 as though fully set forth herein.

56.    Plaintiff and LaPolla entered into a confidential and fiduciary relationship, as discussed hereinabove, and, in reliance on this relationship, Plaintiff entrusted LaPolla and made certain sensitive and confidential disclosures to LaPolla.

57.    LaPolla exploited and breached this confidential relationship by obtaining novel ideas and material from Plaintiff and, with knowledge of the confidentiality of the relationship, ideas, and material, disclosed same to third parties without the consent of (or notice to) Plaintiff.

58.    LaPolla's unauthorized disclosure of Plaintiff's material resulted in that material being produced and monetized without Plaintiff's consent.

59.     The mere disclosure of an idea does not implicate any of the Section 106 rights under the Copyright Act.

60.     Defendants' conduct, as alleged hereinabove, caused Plaintiff general and special damages in an amount to be established at trial.

## FOURTH CLAIM FOR RELIEF

### (MISAPPROPRIATION)

### (Against All Defendants)

61.     Plaintiff repeats, alleges and incorporates by reference paragraphs 1 through 60 as though fully set forth herein.

62.     Plaintiff and LaPolla entered into a confidential and fiduciary relationship, as discussed hereinabove, and whereby Plaintiff trusted LaPolla and made certain sensitive disclosures to LaPolla.

63.     LaPolla exploited this confidential and fiduciary relationship to obtain access to, and exploit, Plaintiff's novel idea.

64.     Plaintiff's idea is novel under New York law as discussed hereinabove.

65.     LaPolla was aware of the confidentiality of the material at issue.

66.     Despite LaPolla's awareness of her obligation to hold Plaintiff's material confidential, she violated that obligation, and her relationship with Plaintiff, by disclosing the idea to third parties without consent.

67.     The mere disclosure of an idea does not implicate any of the Section 106 rights under the Copyright Act.

68.     Defendants, and each of them, exploited and monetized the confidential material obtained by LaPolla from Plaintiff.

69.     Defendants' conduct, as alleged hereinabove, caused Plaintiff general and special damages in an amount to be established at trial.

## FIFTH CLAIM FOR RELIEF

## VICARIOUS AND/OR CONTRIBUTORY COPYRIGHT INFRINGEMENT

### (Against LaPolla and Bradford)

70.    Plaintiff repeats, alleges and incorporates by reference paragraphs 1 through 69 as though fully set forth herein.

71.    LaPolla and/or Bradford financially benefitted from the monetization of the infringing work at issue.

72.    LaPolla and Bradford had the opportunity to oversee, address, manage, and/or supervise the development, creation, marketing, and distribution of the infringing work at issue.

73.    LaPolla and Bradford provided Plaintiff's work to one or more of the Defendants in this action and otherwise took substantial steps to facilitate and contribute to the infringing conduct at issue.

74.    LaPolla and Bradford engaged in such provision with knowledge that it would result in the unauthorized exploitation of Plaintiff's work by third parties.

75.    The foregoing acts violated Plaintiff's exclusive Section 106 rights in her work and caused her actual damage. Said acts were wanton, willful, malicious, and reckless. As such, she seek her lost profits, the disgorgeable profits of Defendants, and, as allowed by law, statutory damages, attorneys' fees, and costs.

### ON ALL CAUSES OF ACTION:

1.    For a preliminary and permanent injunction enjoining Defendants from infringing the copyrights of Plaintiff in any manner;

2.    For actual damages and lost profits, including all revenues lost by Plaitniff and all financial benefits gained by Defendants in connection with the infringement, according to proof;

3.      That Defendants be required to pay to Plaintiff such damages as Plaintiff has sustained in consequence of Defendants' infringements of Plaintiff's copyright and to account for and tender to Plaintiff:

(a)      All gains, profits, and advantages derived by Defendants by his or her infringement of Plaintiff's copyright or such damages as the court shall deem proper within the provisions of the copyright statute, but no less than $5,000,000;

(b)      That Defendants deliver up to be impounded during the pendency of this action all copies of said infringing work as in its possession or under its control and deliver up for destruction all infringing copies and all plates, molds, or other matter used to make infringing copies.

4.      For statutory damages, costs, and attorney fees with respect to *Moxie* and any other derivative works;

5.      For general, special, and exemplary damages in excess of $1,000,000.00

6.      For an accounting;

7.      For costs of suit and interest; and,

8.      For such relief as is just and proper.

///

///

///

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all issues so triable.

Respectfully submitted,

Dated: July 20, 2020                     By:  */s/ Scott Alan Burroughs*
Brooklyn, New York                            Scott Alan Burroughs, Esq.
                                              Laura M. Zaharia, Esq.
                                              DONIGER / BURROUGHS
                                              231 Norman Avenue, Suite 413
                                              Brooklyn, New York 11222
                                              (310) 590-1820
                                              scott@donigerlawfirm.com
                                              lzaharia@donigerlawfirm.com

                                              *with*

                                              Steven T. Lowe, Esq.
                                              LOWE & ASSOCIATES, P.C.
                                              8383 Wilshire Blvd., Suite 1038
                                              Beverly Hills, CA 90211
                                              Telephone: (310) 477-5811
                                              Facsimile: (310) 477-7672
                                              steven@lowelaw.com
                                              (*pro hac vice* application to be
                                              submitted)

                                              Attorneys for Plaintiff
                                              AIMEE CONDAYAN